IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 24-65-M-DWM |
| Plaintiff, | |
| vs. | ORDER |
| FELIPE MICHAEL GARZA, | |
| Defendant. | |

Defendant Felipe Garza is charged with possession with intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. § 841(a)(1), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), and prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 1.) The charges arise out of a traffic stop that occurred in the early morning hours of August 13, 2024, in Lake County, Montana. Garza seeks to suppress the evidence seized from the search of his vehicle on the basis that law enforcement unconstitutionally extended the traffic stop. (Doc. 39.) A motion hearing was held on October 20, 2025. Based on the parties' filings and the testimony and argument presented in open court, the motion is denied.

## BACKGROUND

The factual background is taken from dash and body camera footage of

1

Polson Police Officer Mathew Gomez, the Polson Police Department's dispatch notes, (Doc. 46), and Officer Gomez's testimony at the October 20 hearing. The footage is referenced herein as either "Body" or "Dash" with a timestamp.[1] A timeline of the footage has also been attached as an Appendix. Ultimately, Officer Gomez is a credible witness and the camera footage shows that he handled the traffic stop professionally. And while Garza was not entirely compliant and clearly under the influence of something, he was not violent or physically combative. As shown clearly in the video footage, Garza was sweating, rambling, swaying, bobbing his head, unsteady on his feet, making suicidal and nonsensical statements, and generally incoherent throughout the traffic stop.

At approximately 2:00 a.m. on August 13, 2024, Officer Gomez was traveling north on Highway 93 in Polson, Montana when he observed a black Chevy truck that was traveling the other direction at approximately five miles per hour under the speed limit. Officer Gomez turned his patrol car around and followed the truck when it turned right onto Eighth Street East. (Body 2:51:00.) He then observed the truck make another right onto Fourth Avenue East after failing to stop at a stop sign. (Dash 2:01:42.) After the truck turned the corner, it

---

[1] The timestamps on the dispatch notes and the camera footage are off by approximately one minute. For example, the camera footage shows Officer Gomez calling in his location at 2:02:13 MST but that same call is recorded in the dispatch notes at 02:03:04.

stopped on the lawn of a residence.  (Dash 2:01:42.)  Officer Gomez made the

same turn and saw that the truck did not have a license plate.  (Dash 2:01:59.)

Officer Gomez activated his lights, got out of his patrol car, approached the driver,

and told him that he was being stopped because he did not have a license plate.

(Dash/Body 2:02:35.)

In response, the driver stated that he had just got the truck.  (Body 2:02:51.)

Officer Gomez asked for registration, license, and insurance.  (Body 2:03:01.)  The

driver stated that he did not have his license on him but did have the truck's title.

(Body 2:03:06.)  Officer Gomez asked where the driver lived, and he responded,

"Washington."  (Body 2:03:10.)   Officer Gomez then asked the driver why he was

parked on the lawn, and the driver said he just pulled over because he could not

see.  (Body 2:03:12.)    Officer Gomez asked him if he had anything to drink or

had ingested any other intoxicants; the driver said no.  (Body 2:03:18.)  The driver

identified himself as Felipe Garza, gave his date of birth, and then began to ramble

about why he was in Montana, stating that he did not have his license on him.

(Body 2:03:25.)   After briefly speaking to the other occupants of the truck, Officer

Gomez told Garza he was going to run his information with dispatch.  (Body

2:05:14.)

Sergeant Kyle Cooper arrived, and Officer Gomez asked him to talk to

Garza because he had been driving weird.  (Body 2:05:49.)  While Sergeant

3

Cooper spoke with Garza through the truck's window, Officer Gomez received the

return and confirmed that Garza had an arrest warrant out of Washington.[2] (Body

2:08:45; *see* Doc. 46 at 1.) Officer Gomez asked Garza to get out of the truck,

arrested him on the warrant, and told him that the warrant was for threatening to

shoot officers. (Body 2:10:10.) Garza denied the underlying conduct and argued

with Officer Gomez, stating that he did not want to go to prison for the rest of his

life. (Body 2:10:30.) Garza also stated he had stuff on him, nothing crazy, and he

wanted to get rid of it because he did not want to get caught with it. (Body

2:11:00.) Officer Gomez told him not to reach for it. (Body 2:11:03.) Officer

Gomez and Sergeant Cooper placed Garza in handcuffs, and Officer Gomez told

Garza that he was going to search him. (Body 2:11:10.) Garza continued to ask

his friends to take his stuff, and Officer Gomez told him that what he had on him

was going to jail with him. (Body 2:12:23.) Officer Gomez found a fanny pack on

Garza. (Body 2:12:35.) During this interaction, Garza was sweating profusely and

stated he could not breath. (*See* Body/Dash 2:12:56–2:17:00.) Garza begged

Officer Gomez to let him give his bag to his friends because it had his money and a

little bit of "stuff" in it. (Dash 2:16:39.)

---

[2] At the October 20 hearing, defense counsel intimated that the warrant return may
be for an entirely different person with a date of birth in 1970, not 1993. That is
not supported by any evidence in the record. To the contrary, the dispatch notes
show the warrant return matched the date of birth provided by Garza. (*Compare*
Doc. 46 at 1 *with* Body 2:03:25.)

Officer Gomez advised Garza of his *Miranda* rights but Garza kept interrupting him and at one point, Garza was so unsteady that Officer Gomez told him to sit on the edge of the patrol car because "I don't want you to fall down." (Body/Dash 2:16:10.) Officer Gomez then asked Garza about the "stuff" in the bag, which Garza said was a little bit of dope. (Body/Dash 2:16:39.) Officer Gomez asked if it was "blues" and Garza confirmed that it was. (Body/Dash 2:16:45.) Officer Gomez knew that "blues" referred to fentanyl, a controlled substance under both state and federal law. Garza then said he was "freaking out" and abruptly sat down, prompting Officer Gomez to call for emergency medical services. (Body 2:17:00.) Garza informed Officer Gomez that he used methamphetamine hours before but attempted to clarify that this current state was because he was "just scared." (Body 2:17:41.) However, Garza was slurring his words, sweating profusely, and, at this point, kneeling in the grass next to the patrol car, swaying. (Body 2:17:41.) Officer Gomez asked Garza if the large number of pills he felt in the fanny pack were for distribution or personal use. (Body/Dash 2:18:40.) Garza stated it was for personal use. (Body/Dash 2:18:40.) Garza was in and out of consciousness during the remainder of the contact, rambling that he was "never going to get out of jail" and that they should "just shoot me." (*See, e.g.*, Body 2:19:26 (depicting Garza kneeling next to the patrol car, swaying, eyes unfocused, and head bobbing back and forth).)

5

Officer Gomez informed Sergeant Cooper that he was seizing the truck. (Dash 2:19:19.) A few minutes later, Officer Gomez told Garza that he was concerned that Garza was intoxicated because of how he had been driving. (Body 2:23:15.) Medical services arrived to check on Garza, and Garza told them he wanted them to "fucking kill me." (Dash 2:23:35.) Officer Gomez described Garza's condition to the EMTs and told Garza that they just wanted to make sure he was okay because of how fast he deteriorated and how he was so unsteady. (Dash/Body 2:24:14.) The EMTs asked Garza if they could look him over and he said, "no" and that he hoped he would die. (Body 2:25:00.) Officer Gomez called for a secure tow and told Garza, "I think you are in a tough spot man. When you have a warrant the way you do, man, and then you tell me you have stuff in that bag, and I can feel how many blues are in there." (Body 2:27:07.) At one point, while Officer Gomez was talking to the EMTs, Garza called him back over because Garza "d[idn't] want to be alone." (Body 2:28:30.) After Garza refused treatment, the EMTs left,[3] (Body/Dash 2:30:34), and after sitting, sweating, and swaying for another seven minutes, Officer Gomez put Garza in the patrol car, (Body/Dash 2:37:24). During that time, Garza informed Officer Gomez that there

---

[3] At the October 20 hearing, defense counsel indicated that the EMTs left because "there was no emergency." To the contrary, the footage shows they left after Garza repeatedly declined care. (*See* 2:28:17 (EMT stating, "He won't let us touch him.").)

were both weed and firearms in the truck.  (Body/Dash 2:34:07, 2:35:06.)

A few minutes after Garza was put in the patrol car, Sergeant Cooper approached Officer Gomez and informed him that the warrant entry was an error. (Body 2:39:12.)  In light of the above interactions, Officer Gomez decided to proceed with the arrest and seizure of the truck and took Garza to the police station for DUI testing.  (*See* Body/Dash 2:39:12–2:55:59.)  After obtaining search warrants for the truck and Garza's fanny pack, law enforcement discovered fentanyl, methamphetamine, and firearms.

ANALYSIS

Garza argues that while Officer Gomez had reasonable suspicion to instigate an investigatory stop, he unlawfully extended that stop after he was informed that Garza did not have an active warrant.  That argument lacks merit.

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *United States v. Willis*, 431 F.3d 709, 714 (9th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  Nonetheless, police officers may conduct a traffic stop when they have reasonable suspicion to believe that a motorist has committed a traffic violation. *See United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) ("[T]he Fourth Amendment requires only reasonable suspicion in the context of

7

investigative traffic stops."). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Id.* (internal quotation marks omitted). "An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also be grounded in objective facts and capable of rational explanation." *Id.* (internal quotation marks omitted). If "officers have probable cause to believe that a traffic violation has occurred, the officers may conduct a traffic stop even if the stop serves some other purpose." *Willis*, 431 F.3d at 715.

Here, there is no dispute that the initial stop was valid because Officer Gomez witnessed Garza run a stop sign and observed that he did not have a license plate on his vehicle. *See* Mont. Code Ann. §§ 61–8–344, 61–3–301; *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Garza argues, however, that the officers unlawfully prolonged the stop once they discovered there was not an active warrant out for him. Given the information obtained by Officer Gomez between the time the officers arrested Garza and the time they learned of the warrant error, the entirety of the stop was lawful.

"[A] police stop exceeding the time needed to handle the matter for which

the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). In *Rodriguez*, for example, police lawfully stopped a driver for briefly veering onto the shoulder of the road. *Id.* at 351. After writing a warning and explaining it to the driver, returning the driver's and passenger's documents, and reaching the point where all the reasons for the stop were "out of the way," the officer instructed the driver to turn the car off and conducted a dog sniff. *Id.* at 351–52. The Court held that the dog sniff—although it added only 7 to 10 minutes to the stop—unreasonably extended the stop because it "'prolonged [the seizure] beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 350, 353, 357 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Officers cannot simply extend a stop so long as the circumstances are "reasonable" but rather "a traffic stop may be extended to conduct an investigation into matters other than the original traffic violation only if officers have reasonable suspicion of an independent offense." *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019). The order of events is irrelevant: "[w]hat matter[s] was the added time, not at what point, in the chronology of the stop, that time was added." *Id.* at 866.

Accordingly, Officer Gomez was permitted to ask Garza for his driver's license and inquire about the vehicle's registration. Any further inquiry, however, "was permissible only if it was (1) part of the stop's 'mission' or (2) supported by

independent reasonable suspicion." *Id.* at 868.

I.    **"Mission" of the Stop**

"When stopping an individual for a minor traffic violation, an officer's
mission includes ordinary inquiries incident to the traffic stop." *Id.* (internal
quotation marks omitted). "These involve 'checking the driver's license,
determining whether there are outstanding warrants against the driver, and
inspecting the automobile's registration and proof of insurance,' and each shares
'the same objective as enforcement of the traffic code: ensuring that vehicles on
the road are operated safely and responsibly.'" *Id.* (quoting *Rodriguez*, 575 U.S. at
349). While an officer may "conduct unrelated checks during an otherwise lawful
traffic stop," "he may not do so in a way that prolongs the stop, absent" reasonable
suspicion. *Rodriguez*, 575 U.S. at 355. "Authority for the seizure thus ends when
tasks tied to the traffic infraction are—or reasonably should have been—
completed." *Id.* at 354.

Here, when Officer Gomez ran Garza's information, he was notified that
there was a warrant out for his arrest in Washington for threatening law
enforcement. That information falls within the "mission" of the stop and occurred
within the first ten minutes of the stop, before Garza even got out of the truck.
After the officers learned of Garza's warrant, they detained him, read him his
rights, called medical services for him, and he disclosed drug and firearm

possession, all before the officers learned that the warrant was an error, which did not occur until thirty minutes later. In the absence of any indication that the warrant error was "routine," "widespread," or "intentional," the officers' good faith reliance on it was "objectively reasonable" and the exclusionary rule has not been triggered. *See Herring v. United States*, 555 U.S. 135, 142–47 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."). Accordingly, the officers' interactions with Garza up until that point were valid under the original "mission" of the stop.

Notably, Garza's brief implies that the officers learned that the warrant was invalid much earlier in the stop, right after Officer Gomez read Garza his rights and before emergency medical services were called. (*See* Doc. 40 at 5.) That timeline is belied by both the dispatch records and Officer Gomez's body camera footage. The body camera footage shows a rapid succession at 2:16 a.m. of the reading of *Miranda*, Garza admitting to having "blues," Garza falling to his knees in the grass while sweating, swaying and repeating "I'm freaking out," and Officer Gomez radioing for medical aid. (*See* Body 2:16:13–2:17:03.) Consistently, the dispatch records show that while emergency medical services were requested at 2:18 a.m., dispatch did not learn of the warrant error until 2:32 a.m. (*See* Doc. 46 at 2.) And the body camera footage indicates that Officer Gomez did not learn

about the warrant error until Sergeant Cooper told him approximately seven minutes later. (*See* Body 2:39:12). Thus, by the time the officers learned about the warrant error, Garza admitted to using methamphetamine and possessing "blues," and Officer Gomez personally witnessed Garza's rapid physical deterioration.

## II. Independent Reasonable Suspicion

Accordingly, at the point that the officers learned of the warrant error, they had independent reasonable suspicion to arrest Garza for drug possession and driving under the influence. *Landeros*, 913 F.3d at 868. "[R]easonable suspicion must be individualized," *Thomas v. Dillard*, 818 F.3d 864, 877 (9th Cir. 2016), and an officer "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity," *Illinois v. Wardlaw*, 528 U.S. 119, 123–24 (2000) (internal quotation marks omitted). Reasonable suspicion is an objective inquiry assessed under a "totality of the circumstances." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013).

Here, Officer Gomez observed Garza drive under the speed limit and run a stop sign. Officer Gomez then directly interacted with him for thirty minutes while Garza's physical and mental condition deteriorated rapidly. Garza was sweating profusely, could not stand, said he could not breath, rambled about going to prison, made suicidal statements, and admitted to recent drug use. Garza also repeatedly told Officer Gomez that he had "stuff" on him that he wanted to give to his friends

12

so that he would not get in trouble, admitting that the "stuff" was "blues" or fentanyl. All this information was gathered before Officer Gomez learned that the warrant was no longer valid. Garza's continued seizure was therefore justified based on Garza's admissions and Officer Gomez's observations, which occurred within the lawful scope of the stop.

CONCLUSION

Ultimately, Officer Gomez had reasonable suspicion that a traffic violation had occurred, making the stop lawful. Because independent reasonable suspicion arose during the subsequent interaction, the extension of that stop fell within constitutional authority. Accordingly,

IT IS ORDERED that the motion to suppress (Doc. 39) is DENIED.

DATED this 20 day of October, 2025.

14:18 P.M.

Donald W. Molloy, District Judge
United States District Court